# IN THE UNTIED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

WILLIAM ZUKOWSKI     )
                         )
    Petitioner,        )      NO. 3:08-0759
                         )      JUDGE HAYNES
v.                        )
                         )
TONY PARKER, Warden,   )
                         )
    Respondent.      )

## M E M O R A N D U M

Petitioner, William Zukowski, filed this pro se action under 28 U.S.C. § 2254, seeking to set aside his State conviction on five counts of rape of a child for which he received a sentence of 125 years. After a review of the petition, the Court appointed the Federal Public Defender to represent Petitioner and an amended petition was filed. (Docket Entry No. 12). Petitioner's amended petition[1] asserts the following claims: (1) that the Petitioner had ineffective assistance of counsel; (2) that the trial court erred in finding the rape victim competent to testify thereby denying Petitioner a fair trial; (3) that the trial court's admission of photographs of the victim's

---

[1]The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005) ; Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supercedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supercede the pro se petition. The amended petition adopts and incorporates by reference the claims in the original pro se petition filed in this action, but does not brief nor present argument on all of those claims. Those claims that are not briefed are deemed waived. See United States v. Sandridge, 385 F.3d 1032, 1035 (6th Cir. 2004)("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). A party who has counsel cannot file separate papers, United States v. Howton, 229 Fed. Appx. 362, 370 (6th Cir. 2005), including in habeas actions. Keenan v. Bagley, No. 1:01CV2139, 2010 WL 1133238, at *1 (N.D. Ohio 2010); Adams v. Schwartz, No. CIV S-05-2237 RRB JFM P, 2008 WL 217514, at *1 (E.D. Cal. 2008). Thus, the Court considers only claims briefed in the amended petition filed by his counsel and his counsel's response to the Respondent's motion to dismiss.

genitalia violated Petitioner's right to a fair trial; (4) that the trial court illegally enhanced Petitioner's sentence based upon facts not found by the jury in violation of Petitioner's rights under the Sixth and Fourteenth Amendments. Id. at 13, 19, 22 and 24.

## A.  Procedural History

Petitioner was indicted in Davidson County, Tennessee on 38 counts, including 23 counts of rape of a child under Tenn. Code Ann. § 39-13-522.  Petitioner was first tried on six of those counts for offenses between August 1, 1999 to October 1, 1999.  At the close of proof, one of the six courts was dismissed and of the remaining counts, Counts 1 and 2 involved Petitioner's sexual penetration of the victim and three counts were for his criminal responsibility for those sexual penetrations.  Petitioner was convicted on all five counts.  At his sentencing hearing, Petitioner was sentenced to 25 years on each count, to run consecutive, for an effective sentence of 125 years.

Petitioner later entered a "best interest" plea to the remaining counts: three counts for rape of a child between January 1, 1999 and December 4, 1999 and one count of aggravated rape between January 1, 2000 and May 1, 2000.  Different counsel represented Petitioner in his plea agreement with a sentence of 25 years for each of the four counts to be served concurrently with his 125 year sentence.  The remaining counts of the indictment were retired.

Petitioner appealed his state trial convictions to the Tennessee Court of Criminal Appeal that affirmed.  State v. Zukowski, 2003 WL 213785 (Tenn. Ct. Crim. App. Jan. 31, 2003).  The Tennessee Supreme Court denied his application for review on May, 19, 2003.  Id.

Petitioner filed a post-conviction petition challenging his trial convictions and the convictions based upon his guilty plea.  After appointment of counsel, the state trial court held an

2

evidentiary hearing and denied the petition. On appeal, the Tennessee Court of Criminal Appeals affirmed. Zukowski v. State, 2008 WL 110096 (Tenn. Ct. Crim. App. May 12, 2008).

Petitioner then filed a motion to re-open his post-conviction proceeding, to assert the claim that the state trial court's factual findings to enhance his sentence violated Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004) and Cunningham v. California, 127 S. Ct. 856 (2007), that the state court adopted in State v. Gomez, Tenn LEXIS 884 (Tenn. Oct. 9, 2007). The state trial court denied Petitioner's motion to reopen and on appeal, the Tennessee Court of Criminal Appeals ruled that the trial court's order was not an abuse of discretion. (Docket Entry No. 10-1).

## B. Review of the State Record

On Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made extensive findings[2] on the facts underlying Petitioner's convictions.

A. Trial

The following evidence was presented at trial. Deborah Gail Mayberry, a special education teacher at McMurray Middle School, testified that she had been a teacher for four years and that prior to teaching, she had been a special education assistant for eighteen years. She stated that she had taught eighth and ninth grades at McMurray for the past two years. Mayberry testified that there are three different classifications for the special education students at McMurray Middle School. According to Mayberry, McMurray offers a "life skills" class for children who are "very low functioning," five resource classes for children who "are a little lower academically than the other students," and a "Moderate Intervention Program for fragile children." She testified that she taught the Moderate Intervention class and explained that the class is for children of varying academic levels who have emotional issues.

―――――――――――――――

[2]State appellate court opinion findings can constitute factual findings in a habeas action . Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(e)

3

Mayberry testified that she taught the victim during the 1999-2000 academic year. She stated that the victim was in the seventh grade and that the victim was moved from one of the resource classes to her class around January 2000. Mayberry stated that she thought the victim had just turned twelve years old when she entered her class. She testified that the victim was academically very low functioning, that she was probably functioning at about a third or fourth grade level, and that she was also mildly mentally retarded. According to Mayberry, in order to be classified as mildly mentally retarded, a child must academically function significantly lower than his or her peers, and he or she must also have an extreme deficit in two adaptive areas such as social skills, community involvement, self-care, family participation, or the ability to make friends. She testified that mildly mentally retarded children also have difficulty with reasoning and abstract thinking.

Mayberry testified that the victim was in her classroom all day. She described the victim as "a very sweet child" who "loved everybody." Mayberry stated that the victim "trusted everybody" and could sometimes be "too trusting" of people. She also stated that the victim was truthful. Mayberry testified that the victim finished the seventh grade at McMurray and then transferred to another school the next year. Mayberry testified that in the spring of 2000, she made a referral to the Department of Human Services regarding the victim, and someone from the Department of Children's Services visited the school.

On cross-examination, Mayberry maintained that the victim was very truthful and trusting. She testified that the victim's memory regarding life experiences seemed to be "pretty good." Mayberry testified that the victim often repeated the same stories. She acknowledged that she did not know the accuracy of the victim's stories.

The victim testified that she was fourteen years old and that she was born on December 5, 1986. She stated that she was in the eighth grade and that she lived with her Aunt Carol, to whom she referred as "mom." The victim testified that the Defendant is her uncle and that he was married to Carol. She recalled that when she was in the seventh grade, she attended McMurray Middle School, where Ms. Mayberry was her teacher. She reported that when she attended McMurray, she was living in a house on Patterson Street with the Defendant; his wife, Carol; and the victim's brother, Chris. The victim identified the Defendant in court.

The prosecution showed the victim a picture of a female. The victim testified that the girl in the picture was not wearing clothes. The victim identified several parts of the girl's body, including the breasts (which she referred to as the chest), the vagina (which she referred to as the "front private"), and the "butt." The prosecution then showed the victim a picture of a man. The victim stated that the

4

man was not wearing clothes. She then identified several parts of the man's body, including the chest and the penis (which she referred to as the "[f]ront private").

The victim acknowledged that she knew the difference between "a good touch and a bad touch." She stated that a teacher patting her on the back would be a "good touch." However, she testified that if someone touched her on her chest or her "front bottom part," that would be a "bad touch."

The victim acknowledged that when she was in the seventh grade, she knew a man named "J.D." During cross-examination of the victim, "J.D." was identified as J.D. Gaines. She stated that J.D. was a "CB friend" of the Defendant's. She testified that the Defendant drove for a trucking company. The victim reported that the Defendant's CB nickname was A.K., which stood for "Arizona Kid," and that her own CB nickname was "Blondie." The victim recalled meeting J.D. on one occasion at a Waffle House, and she also recalled him visiting her house.

The victim testified that on one occasion while she was in the seventh grade, she and the Defendant helped J.D. move. She recalled that the Defendant drove his green Ford truck. The victim stated that J.D. moved from a house to a duplex and that the move took place during the daytime. She identified in court photographs of both J.D.'s house and his duplex. The victim recalled packing boxes for J.D. and seeing the boxes being loaded into the Defendant's truck. She testified that the boxes were then taken to J.D.'s duplex.

The victim testified that once at the duplex, she unpacked boxes in different rooms. She testified that at one point she went into the bedroom with the Defendant and J.D. When asked what happened in the bedroom, the victim stated, "They touched me." She recalled that the Defendant was the first one to touch her and that he touched her on the chest on top of her clothes. The victim testified that J.D. then touched her chest underneath her clothes. The victim testified that the Defendant and J.D. "made [her] suck their front private." She stated that the Defendant forced her to perform the act first. The victim reported that the Defendant grabbed her neck and pushed her head down. She testified that the Defendant "made [her] move [her] head back and forth." The victim testified that after performing oral sex on the Defendant, "[h]e stuck his front private in [her vagina]." She explained that the Defendant pushed her backwards onto the mattress and got on top of her. The victim testified that the Defendant took off her pants and underwear. She stated that the Defendant was wearing underwear.

The victim testified that the Defendant stopped the rape when "[h]e came." She explained, "White stuff came out of his front private." She stated that the Defendant ejaculated onto her stomach. The victim testified that after the Defendant was finished, "[h]e shrugged his head at J.D.," who had been in the

5

room the entire time. She testified that J.D. then "did the same thing." She stated that J.D. "forced [her] to suck his front private." The victim explained that J.D. "grabbed the back of [her] neck, the same place [the Defendant] did." She testified that J.D. also made her move her head back and forth. The victim testified that after performing oral sex on J.D., he "stuck his front private in [hers]" and "[m]oved back and forth." She recalled that J.D. stopped when "[h]e came." She explained that "[w]hite stuff came out of his front private" onto her stomach. The victim recalled that J.D. also "[p]ut his mouth on [her] front private" and "moved his tongue in a circle."

The victim testified that after the encounter with the Defendant and J.D., she cleaned off her stomach, got dressed, and "finished unpacking the truck." She testified that neither the Defendant nor J.D. said anything to her. She recalled that it was night when they finished unpacking. The victim testified that before she went with the Defendant to help J.D. move, the Defendant told her that "J.D. was going to make [her] suck his dick." The victim testified that both the Defendant and J.D. were in the room during the entire encounter.

The victim testified that a condom is "something a guy puts on his front private to make sure a girl doesn't get pregnant." She stated that neither the Defendant nor J.D. wore a condom when they sexually penetrated her. The victim reported that she started her period when she was nine years old. She recalled that the incident at J.D.'s duplex took place while she was in the seventh grade. She testified that she was attending McMurray Middle school at the time. The victim testified that she previously called the Defendant "dad," but she now calls him Bill.

On cross-examination, the victim testified that she lived with her birth mother, Pamela, until she was eight years old, and then she went to live with the Defendant and his wife. She stated that she has a brother named Chris who also went to live with the Defendant and his wife. The victim testified that Chris now lives with their birth mother.

The victim testified that she had attended North Parkway Middle School for two weeks and that prior to attending North Parkway, she had attended Selmer Middle School. She stated that she attended Selmer for half of her eighth-grade year, and prior to that, she had attended McMurray Middle School. The victim could not remember the name of her teacher at Selmer Middle School.

The victim maintained that she helped J.D. Gaines move only once. She stated that Gaines moved on one other occasion, and she watched his children. She stated that her brother did not help with the move. The victim testified that during the rape, Gaines's girlfriend, Debbie, was at work. The victim testified that she was interviewed a couple of times by police, but she admitted that she did not

6

mention the encounter in this case.

The victim testified that after the Defendant was arrested, her brother went to Kansas to live with their birth mother. She reported that the Defendant and his wife divorced, and the victim stayed with her aunt. The victim testified that she wanted to go to Kansas also, but her aunt wanted her to stay with her in Tennessee. She identified in court two letters that she had written to her mother. One of the letters, dated June 17, 2000, stated, "Dear Mom, I want to come home. I hate her." The victim acknowledged that she wrote, "[S]he beats the shit out of me." The victim also acknowledged that in the other letter, she wrote, "She beats me when I talk to you. She leaves bruises. Get me out of here. I can't take it anymore. I hate it here. Get me out, please. I want out."

The victim testified that she was punished whenever she did not do what Carol wanted her to do. She stated that the last time her aunt "beat" her was when the Defendant was still living in her aunt's home. However, she admitted that she wrote at least one of the letters after the Defendant had left the home. The victim testified that she wanted to live with her birth mother. She acknowledged that if she told the court that the Defendant did not rape her, she would be punished. The victim testified that she lived in Nashville and that she lived in Nashville the previous summer. On re-direct examination, the victim maintained that she told the truth about the incident at the Gaines home.

Sue Ross testified that she is a pediatric nurse practitioner at Our Kids Center in Nashville, Tennessee. She stated that Our Kids is an outpatient clinic of General Hospital that is designed primarily to perform medical evaluations of children who are alleged to have been sexually abused. Ross testified that between 600 and 800 children are evaluated at the clinic each year. She testified that as a nurse practitioner, she performs physical examinations on children and is capable of diagnosing common childhood illnesses. The defense stipulated that Ross is an expert in the field of child sexual abuse evaluations.

Ross testified that she is one of two nurse practitioners in the clinic who perform physical evaluations on children. She stated that the clinic also has a "psycho-social staff," which includes two social workers and a child psychologist. The staff gathers information about the child and often interviews the child and whoever brings the child into the clinic. Ross testified that she had been at Our Kids Center for ten years and that she had examined approximately three thousand children. She testified that records are kept on all of the children who are examined at the clinic.

Ross testified that a "head to toe examination" that "includes a focus on the genital area" is performed on children brought into the clinic who are suspected of

being sexually abused. She reported that for the genital area, a culposcope is used. Ross testified that a culposcope is "nothing more than a medical term for ... a pair of binoculars that's mounted on a stand, with a light source, and a 35mm camera attached to it." Ross testified that the culposcope magnifies the genital area so that it is easier to see. Ross testified that photographic slides of most children who are examined are maintained at the clinic.

Ross testified that the victim in this case was examined at Our Kids Center in May 2000. She stated that another pediatric nurse practitioner at the clinic, Barbara Speller-Brown, performed the exam on the victim. Ross reported that Speller-Brown moved to Washington D.C. in August 2000. However, Speller-Brown took notes on the examination which Ross reviewed before testifying. Ross stated that she also reviewed slides that were taken of the victim's genital area.

According to Ross, Speller-Brown noted that she observed injury to the victim's hymen and that there was "very little hymenal tissue in a certain position of the hymen." Ross testified that if the face of a clock were to be superimposed on the victim's genital area, the victim was missing hymenal tissue from four o'clock to seven o'clock. She reported that the hymen "is basically a piece of tissue that serves ... for lack of a better term, sort of a gateway ... into the vagina." Ross explained that when most people think about the female's external genitalia, they visualize the labia, or the outer lips. She stated that when the labia is parted, there is an opening that leads into the vagina. Ross testified, "Before you actually get to the vagina, though, in prepubital and in adolescent children, you will have hymenal tissue." Ross then illustrated her testimony by using two slides of the victim's genital area.

Ross testified that the injury to the victim's vagina indicated that there was a "penetrating trauma to the area." She testified that the victim's aunt, Carol Zukowski, brought the victim to the clinic. Ross testified that medical histories were obtained from both the victim and Zukowski. Neither the victim nor Zukowski indicated that the victim had suffered from any injury other than sexual penetration. Ross testified that absent an accidental injury, sexual penetration was the most likely explanation for the trauma. However, she testified that it was not possible to determine who caused the injury. Ross testified that the victim informed the clinic that she had been sexually penetrated by a person named Phillip. She stated that the victim did not indicate whether the penetration was consensual.

On cross-examination, Ross testified that there was no way to determine when the injuries to the victim occurred. She stated that the victim's aunt provided information that the victim had been forced to perform oral sex and was sexually

penetrated by a man named Phillip Young in January 1999. Ross acknowledged that the incident could explain the victim's injury. She also acknowledged that sexual intercourse with J.D. Gaines could explain the injury.

Joseph Gaines testified that at the time of the Defendant's trial, he was in jail for the rape of the victim. Gaines admitted that during the move of his residence in September 1999, he engaged in sexual acts with the victim. He also acknowledged that he had been charged in Florida with sexual abuse against his daughters, but that he was never convicted of those charges.

Gaines testified that he met the Defendant "on the CB radio" and that he had known the Defendant since around the middle of 1997. He stated that at some point, he worked with the Defendant at Brentwood Security. Gaines testified that his "CB handle" was "J. D." and that most people knew him as "J. D." He stated that the Defendant's "handle" was "A. K.," which stood for "Arizona Kid." Gaines testified that he also knew the victim. Gaines testified that the prosecution did not offer him any deals in exchange for his testimony and that he was giving his testimony because "the truth needs to be told."

Gaines testified that in the summer of 1999, he lived on Jacksonian in Hermitage, Tennessee. He stated that in September, 1999, he moved to a duplex on Lebanon Pike. Gaines testified that the Defendant and the victim helped him with his move. He stated that he asked the Defendant to help him move because the Defendant had a pickup truck.

Gaines admitted that he engaged in sexual acts with the victim in one of the bedrooms of the residence on Lebanon Pike. He stated that he performed oral sex on the victim and then vaginally penetrated her. Gaines testified that he ejaculated on the victim's stomach. He reported that the Defendant was present in the room when Gaines performed the acts on the victim. Gaines testified that the Defendant also engaged in sexual acts with the victim. He recalled that the victim performed oral sex on the Defendant and that the Defendant vaginally penetrated the victim. Gaines testified that while he was performing oral sex on the victim, the Defendant told him that "whatever [Gaines] was doing, to keep on doing it, because [the victim] was apparently liking it." Gaines testified that after he and the Defendant both raped the victim, the Defendant told Gaines "that if it would have been his daughter, he wouldn't have done it." He identified in court a picture of the duplex where he and the Defendant raped the victim. Gaines testified that he did not wear a condom during the rape and that he did not notice if the Defendant wore a condom.

On cross-examination, Gaines testified that he moved at least three times between 1997 and 1999, but he maintained that the Defendant helped him move only once,

9

when he and the Defendant raped the victim. Gaines stated that Rebecca Burnette was his step-daughter and that Elaina Gaines was his daughter. He testified that Burnette had myatonia dystrophy which affected the nerve endings of the muscles. He stated that Burnette also had learning disabilities, but she was able to graduate from high school. Gaines testified that in 1987 he was accused of raping Burnette. He did not recall allegations involving Elaina Gaines. However, he later admitted that he was arrested for molesting Elaina Gaines. Gaines acknowledged that on June 19, 2000, his children, Brady and Shania Gaines, were removed from his home. Gaines maintained that he never touched his own children.

Gaines testified that when he was first approached by police regarding the Defendant, he did not tell them that he had sexually assaulted the victim or that he had seen the Defendant sexually assault the victim. Gaines testified that he then told police that the victim was the sexual aggressor. He stated that the victim was "grabbing [his] private parts" while he was trying to pack up his house and that he told her "no."

Detective David Zoccola testified that he works for the Davidson County Metropolitan Police Department in the youth services division and that he was assigned to the Child Physical and Sexual Abuse Unit. Zoccola testified that he had been a police officer for twenty-four years and that he had been investigating child abuse cases for three years. Zoccola testified that in May 2000, he was assigned to investigate this case. Prior to Zoccola being assigned to the case, Detective Chad Slagle had been investigating a case involving the victim. Zoccola testified that Slagle identified the Defendant and a man named Phillip Young as being suspects in the case. Zoccola recalled that Young was seventeen years old, lived in the same neighborhood as the victim, and was a friend of the victim's brother. According to Zoccola, Detective Slagle investigated a case in which Young was accused of approaching the victim on the street, forcing her into a ditch, and raping her. Zoccola testified that he interviewed Young and that Young "made admissions that he had numerous sexual encounters with [the victim]."

Zoccola testified that he was assigned to the case on May 15, 2000 when a second complaint was made to the police department regarding the victim. Zoccola testified that he spoke to the Defendant on May 16, 2000. He stated that sometime after speaking to the Defendant, he spoke to the Defendant's wife, Carol Zukowski. According to Zoccola, Carol Zukowski provided police with a list of names of those who had had contact with the victim. The list included people in the "CB radio network." Zoccola testified that J.D. Gaines's name was on the list furnished by Carol Zukowski.

Zoccola testified that he interviewed Gaines in the parking lot of a Shoney's restaurant. He stated that as a tactical matter, he told Gaines that he was interested

10

in obtaining information about the Defendant. Zoccola reported that Gaines told him that he and the Defendant had engaged in sexual acts with the victim at Gaines's duplex. According to Zoccola, Gaines said that he had performed oral sex on the victim and that he had engaged in sexual intercourse with the victim. Zoccola testified that Gaines also told him that he made the victim perform oral sex on him. Gaines told Zoccola that the Defendant had engaged in sexual intercourse with the victim on a day when the Defendant and the victim were helping Gaines move. Zoccola testified that he did not make any promises to Gaines in exchange for the information he provided. He stated that Gaines expressed remorse for what he had done to the victim.

On cross-examination, Zoccola testified that when he was assigned to this case, the Defendant was the primary suspect whom he was assigned to investigate. He testified that he interviewed the victim on May 16, 2000 and that there was no mention of any encounters involving Gaines and the Defendant. Zoccola testified that he was also present on May 17, 2000 when the victim had a forensic interview. He stated that during the May 17 interview, the victim mentioned inappropriate behavior by the Defendant, but she did not mention Gaines.

Zoccola testified that after the Defendant was taken into custody on May 16, 2000, he did not return to his home with Carol Zukowski. He stated that Carol Zukowski retained custody of the victim, but the victim's brother, Chris, went to live with his birth mother in Kansas. Zoccola acknowledged that Gaines did not immediately admit to raping the victim or seeing the Defendant rape the victim. Zoccola also acknowledged that at one point in the interview, Gaines stated that the victim approached him about having sex.

Zoccola reviewed two letters written by the victim that were sent to the victim's birth mother, Pamela Crowson. Zoccola testified that he received the two letters by fax on June 27, 2000. He stated that he was made aware that according to a court order, custody of the victim was to be returned to Crowson. Zoccola acknowledged that the victim remains in the physical custody of Carol Zukowski. He testified that the victim was interviewed regarding the allegations she made against Carol Zukowski in her letters. On re-direct examination, Zoccola testified that his interview of the victim, during which she failed to mention Gaines or the Defendant, occurred while the victim was still living in the Defendant's home.

Chris Zukowski testified that the Defendant is his uncle and that he refers to the Defendant as "Dad." He stated that the victim is his sister and that Carol Zukowski is his aunt. Zukowski testified that he lived with the Defendant and Carol Zukowski for approximately eight years. He reported that in May 2000 he moved to Kansas to live with his mother. Zukowski testified that he was sixteen years old and that he was attending Winfield High School Diploma Completion

11

Course.

Zukowski recalled helping J.D. Gaines move "[k]ind of one and a half" times. He explained that the first time he helped, he just threw garbage away. Zukowski testified that the "half" move to which he referred occurred before spring or summer break in 1998 or 1999. He stated that he, the Defendant, his aunt, and the victim all helped Gaines move. Zukowski testified that he also helped Gaines move in September 1999 immediately after school began. He recalled that he, the Defendant, the victim, Zukowski's girlfriend (Abigail Diganazaday), Gaines's wife and two children all helped with the move. He testified that his girlfriend had since moved back to Iran.

Zukowski testified that during the move, the victim "pretty much babysitted the two kids." He reported that they helped move about five or six "loads" of items to Gaines's new duplex. Zukowski testified that he did not go to the new house each time. He recalled that on one trip which occurred right before dusk, the Defendant, Gaines, the victim and Zukowski's girlfriend went to the new home. He testified that they were gone about fifteen or twenty minutes. Zukowski recalled that when the victim returned, she helped do some more packing and helped take care of the children. He reported that the victim was happy. He testified that everyone went on the last "run" to the house.

Zukowski testified that the victim told him that Phillip Young had raped her. However, he testified that the victim never mentioned being raped while helping J.D. Gaines move. Zukowski testified that he and the victim were "pretty close." He recalled that when he and the victim lived together, they would "[q]uite frequently" talk about sex. Zukowski believed that his sister would have told him if she had been raped. He testified that he had not seen the Defendant since the Defendant had been arrested.

Zukowski testified that when he and the victim first went to live with the Defendant and Carol Zukowski, Carol was kind to the victim. However, he stated that things changed when the family moved to Nashville. He recalled that Carol Zukowski began to spank the victim about two or three times a week, and that Carol Zukowski would not always paddle the victim on her bottom. He reported that the worst incident occurred when Carol Zukowski caused the victim to have a dislocated shoulder, a bloody lip, a black eye, and bruises on her arms and legs. Zukowski testified that he saw Carol Zukowski beat the victim with her fists four times. He stated that the victim feared the beatings by Carol Zukowski and that the victim wanted to live with their real mother. Zukowski testified that the victim was easily manipulated by people. He stated that when Carol Zukowski would beat the victim, the victim would tell people that she had run into a wall or that she had been "roughhousing."

12

On cross-examination, Zukowski testified that he left Nashville in May 2000. He stated that he last saw Carol Zukowski beat the victim about four weeks before he left Nashville. Zukowski testified that he tried to stop Carol Zukowski from beating the victim, but a man named John Potts prevented him from entering the victim's room. He stated that he got in trouble for the beating because Carol Zukowski "rearranged" the story. Zukowski acknowledged that he did not trust J.D. Gaines and that Gaines was "perverted." He testified that he only helped for one day of the move. However, even though he stated that he and the Defendant were close and that he called the Defendant "dad," Zukowski testified that he never mentioned anything to the Defendant about Gaines. On re-direct examination, Zukowski testified that the last time he talked to the victim was in August 2000. He stated that since then, Carol Zukowski has not allowed him to talk to the victim.

The victim's biological mother, Pamela Crowson, testified that the Defendant is her brother. She stated that she spoke to the victim after the victim testified at the Defendant's trial. Crowson recalled that she, the victim, Christopher Zukowski, and Carol Zukowski walked to see Crowson's dog that was in her truck. She testified that she and the victim were a few steps away from Carol Zukowski and Chris Zukowski when the victim told her, "Carol's making me say things that are not true." Crowson stated that the victim had made similar statements in the past. She testified that the victim also told her that she wanted to go with Crowson.

On cross-examination, Crowson testified that at one time she was close to the Defendant, but she stated that she was no longer close to him. She stated that she came to the Defendant's trial because defense counsel wanted her son, Chris Zukowski, to testify. Crowson acknowledged that defense counsel wired her money to come to Nashville. She believed that her son did not like Carol Zukowski. However, she stated that Chris Zukowski and Carol Zukowski walked to her car together, while she and the victim walked together. Crowson reported that the victim had been living with Carol Zukowski and the Defendant for approximately four or five years. She testified, "Detective Zoccola is a liar." She also stated that the victim told her that she was lying. Crowson testified that she called Detective Zoccola on multiple occasions to tell him that Carol Zukowski was beating the victim. She testified that she had not been in Nashville for five years and that she could not afford to come visit her children. However, she stated that she wanted the victim to live with her.

On re-direct examination, Crowson testified that the Public Defender's Office wired her $100.00 to travel to Nashville for the Defendant's trial. She stated that she sent a "court paper" from Arizona to Cliff Banister at the Department of Human Services indicating that she had custody of the victim. Crowson also testified that she sent money to her children so they could visit her in Arizona. She

stated that she had not seen the victim in a year and a half because Carol Zukowski would not let her have any contact with the victim.

In rebuttal, the victim was called to testify. The victim testified that after her original testimony, she spoke to Pamela Crowson. However, the victim denied telling Crowson that she was being forced to say things that were not true. On cross-examination, the victim testified that she was going home with Carol Zukowski after the trial.

Zukowski, 2003 WL 213785, at **1-10.

As to Petitioner's sentencing claim, the Tennessee appellate court made additional findings of fact.

B. Sentencing Hearing

Detective David Zoccola testified that he was assigned to this case on May 15, 2000 following an offense report involving the victim. According to Zoccola, the report was initiated by two brothers on May 14, 2000. He testified that he could not locate the person that filled out the report, but he was able to locate a witness named Andrew Herps who was listed in the report.

Zoccola reported that he contacted Herps, and Herps had a conversation with the Defendant that was recorded by police. During the conversation, the Defendant agreed to allow Herps to bring three or four other individuals to the Defendant's house to engage in sex with the victim. Zoccola testified that during the conversation, Herps and the Defendant talked about how "it" had to be done by four o'clock because that was when the Defendant's wife got home. Zoccola stated that Herps and the Defendant joked about a bet the Defendant made with Herps that he would pay him $5.00 if he could make the victim have an orgasm before the boys did. He testified that during the conversation the Defendant said that he had to be in the home when the acts occurred.

Zoccola testified that after hearing the taped conversation between Herps and the Defendant, he realized that the victim's living arrangements had become an emergency situation and removed the victim from the home. He recalled that the Defendant was taken to the police station that day for a "fairly lengthy interview." Zoccola testified that the Defendant described the victim as a caring, trusting, loving and truthful child. He reported that the Defendant stated that the victim had an illness when she was young and that a fever relating from the illness caused her to be "very slow." Zoccola testified that he explained to the Defendant why he was being questioned and that he gave the Defendant about a five or ten minute

14

explanation of various things that he believed that the Defendant had been doing to the victim. Zoccola testified that after the explanation, the Defendant basically said, "I never watched."

According to Zoccola, the Defendant confirmed that Andrew Herps was bringing other males into the Defendant's home and that the Defendant was aware that the other males were coming to the house to engage in sexual intercourse with the victim. Zoccola testified that the Defendant confirmed that over a two-year period, approximately twenty-five men came into the home to have sex with the victim. He stated that the Defendant indicated that the victim was eleven and twelve years old when the rapes occurred.

Zoccola testified that all of the witnesses stated that the Defendant was present in the home when the sexual acts occurred. Zoccola testified,

> [The Defendant] laid out ... this situation where he felt like [the victim] was going to be sexually active. So, knowing that he didn't have much control over that, according to him, he, basically, talked or discussed with [the victim], look I know you're going to have sex. If you're going to have sex, we'll do it here in the home, where I can basically, monitor things. And he ... began to describe that when the sex would go on, he would be in the next room or out in the den. It's a rather small house. And I guess the easiest way to say it is that he would supervise things. He would ... be able to hear and monitor if things got out of hand. And he even went down a list of things that he would and would not allow. He would not allow any of the men to physically abuse her. He would not allow any of the men to hit her. He would not allow more than one man at a time having sex. He would not allow any foreign objects. He would not allow several other things, that I would have to look at the list. But he, basically, went down, I guess, the rules that ... these guys would have to go by when they engaged with sex.

Zoccola testified that the Defendant denied having sex with the victim. He stated that the Defendant indicated that there were "numerous times" that as many as three or four guys would come to the house with the intention of having sex, but the men would have to go into the victim's room separately to have sex with the victim. Zoccola testified that the Defendant had a big C.B. radio antenna at his house and that the whole family would talk on the radio. He stated that the Defendant met a number of his friends by talking on the radio. Zoccola testified that the Defendant's family's social life revolved around people whom they had met on the radio. The group of men with whom the Defendant associated because of the radio included John Potts, Larry Dowell, and Joseph Cain, who were all

15

charged in this case.

Zoccola testified that approximately seven juveniles were also charged in this case. Zoccola stated that according to the witnesses he interviewed, the rapes had been occurring for over two years. He testified that the types of acts included predominately oral sex, but "there was a lot of mention of intercourse." Zoccola testified that the Defendant admitted that "about the only thing he wouldn't allow was anal sex." He recalled that the Defendant stated that a lot of the sexual activity began to occur while he was home with an injury. Zoccola testified that the victim would have been eleven or twelve years old and possibly even younger when the acts occurred. He stated that the acts continued after the incidents in this case until the time the Defendant was arrested. On cross-examination, Zoccola testified that one of the men, John Potts, who was a member of the C.B. club, was also Carol Zukowski's lover.

Frankie Cowan, the Clinical Director of the Nashville Child Advocacy Center in Nashville, testified that she has been the director for four years. She stated that her responsibilities at the center were to supervise two clinical therapists and two forensic interviewers. Cowan testified that she also engaged in therapy with children and handled a support and education group for parents of children who have been sexually abused. She stated that she had been working with victims of child abuse for approximately eight years and that she had been working in the field of mental health for twenty years. Cowan testified that during her career, she had worked with about four or five hundred children. She testified that she had a master's degree in psychology.

Cowan testified that she counseled the victim eight times beginning in May 2000 until the victim relocated to another city with her aunt. She reported that the victim exhibited symptoms of post-traumatic stress disorder. Cowan testified that the victim was suffering from nightmares and had "a lot of generalized fears," such as the loss of a family member. According to Cowan, the victim was also fearful about talking about the abuse because she thought it was her fault. She stated that the victim did not know who to trust and that the victim "had, basically, no family support." Cowan testified that the victim had not seen her natural mother in four years and had been entrusted to the uncle who raped her. Cowan testified that the victim needed love and affection, but confused these emotions with sexual activity. She stated that the victim had very poor judgment regarding whom to trust and how to deal with other people. Cowan testified that these traits are often seen in children who exhibit the worst long-lasting effects of sexual abuse. She explained that the abuse was very confusing to the victim especially because it was done by her caregiver.

Cowan opined that when the perpetrator of sexual abuse upon a child is also the

16

child's caregiver, the resulting betrayal of a "trusting relationship" between child and caregiver becomes an overriding factor in determining whether a child is "going to be permanently affected." She further testified that the betrayal by the Defendant, coupled with the lack of family support, left the victim "a sitting duck for future victimization of every type." Cowan stated that adult survivors of child sexual abuse often confuse affection and love with sexual activity and thus do not have good judgment in choosing partners. She testified that this was "one of the worst cases [she had] ever seen, as far as predicting what [the victim's] ... future would be, as far as having healthy relationships with other people." Cowan stated that she did not expect the victim to lead a reasonable, normal life after the abuse.

On cross-examination, Cowan testified that she had received training on perpetrators and had counseled perpetrators in the past. She stated that frequently perpetrators are the victims of abuse. Cowan testified that when she met with the victim, the victim's family consisted mainly of her aunt and that they were moving residences. She reported that she did not have any contact with the victim since May or June 2000. However, Cowan stated that she was informed that the victim had been in a psychiatric hospital.

Dr. Joan Sliger testified that she had a doctorate degree in clinical psychology from Vanderbilt University and that she had been practicing psychology since 1975. Sliger reported that she worked for a couple of years at the Middle Tennessee Mental Health Institute after she obtained her master's degree but before she had obtained her doctorate degree. She testified that during that time, she performed forensic psychological examinations. Sliger reported that she returned to performing forensic evaluations about six or seven years prior to the trial in this case. She testified that her primary vocation is psychotherapy.

Sliger testified that she interviewed and tested the Defendant for about five and a half hours on one day. Sliger testified that the Defendant had some "history" that was very difficult for him to talk about. She stated that the Defendant indicated that when he was young, he and his brother had been sexually molested for a period of about two years by a man who was a friend of his parents. According to Sliger, the abuse began when the Defendant was approximately eight years old. She testified that the Defendant said that the police interviewed him and his brother about the abuse. Sliger reported that following the incident, the Defendant's mother "cried a lot" and the Defendant's father possibly developed a drug dependence. She stated that she thought that the Defendant's perpetrator had molested approximately twenty-two victims.

Sliger testified that in cases of child sexual abuse, "it is most important to provide counseling to the victims." She stated that the Defendant's father dealt with the rapes of his sons by pretending that it never happened. Sliger testified that the

17

Defendant informed her that the victim's mother, the Defendant's sister, was also a victim of rape. She stated that after his sister's rape, the Defendant directed his anger at his sister's rapist. Sliger testified that the Defendant's rape caused him to believe that no one had any control over their own body. She stated that when she interviewed him, the Defendant had never actually talked to anyone about his childhood rapes, and she explained that it would therefore be "hard to know how [his victimization and his treatment of the victim] related. She stated, however, that "statistically, you look for those things in a perpetrator."

Sliger testified that the Defendant was given a test called the MMPI which did not indicate that the Defendant had any sort of psychosis. She stated that the Defendant was bright, that he appeared to have "good sense," and that he was not "crazy." Sliger testified that she was "puzzled" by the results of the Defendant's "paranoid scale." She reported that the Defendant scored exceptionally low, which indicated that he did not have any "suspiciousness" in him. Sliger testified that the abuse that the Defendant suffered as a child likely played some part in his abuse of the victim.

On cross-examination, Sliger acknowledged that she spoke to the Defendant on only one occasion for about five and a half hours. She stated that she obtained all of her information concerning the Defendant from the Defendant during that time and from documentation provided to her by defense counsel. She acknowledged that the abuse of the Defendant as a child did not excuse the Defendant's behavior. She also stated that adults should be held accountable for their behavior.

Id. at 10-14. The Tennessee appellate court's other factual findings on Petitioner's claims are set forth in the context of Petitioner's specific claims.

### B. Conclusions of Law

Actions under 28 U.S.C. § 2254 are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding unless that state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

18

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. at 413. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "the holdings as opposed to the dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time [the Petitioner's] state-court conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. "Even if a federal court could determine that a state court incorrectly applied federal law, the court still

19

could not grant relief unless it also finds that the state court ruling was unreasonable." <u>Cristini v. McKee</u>, 526 F.3d 888, 897 (6th Cir. 2008). The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." <u>Mitchell v. Mason</u>, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

For habeas relief, all federal law claims must be fairly and properly presented to the state courts. <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971). A claim supported only by citation to state law is insufficient to present a federal claim, even if the cited state decision restated an analysis of federal law. <u>Anderson v. Harless</u>, 459 U.S. 4, 7 n.3 (1982) (<u>per</u> <u>curiam</u>). As to how the facts and federal legal theory must have been "fairly presented" to the state courts, in <u>Duncan v. Henry</u>, 513 U.S. 364, 365-66 (1995) (<u>per</u> <u>curiam</u>), the Supreme Court stated: "If state courts are to be given the opportunity to correct alleged violations of prisoners, federal rights, they must surely be alerted to the facts that the prisoner are asserting claims under the United States Constitution." <u>Id.</u> (citing <u>Picard</u> and <u>Anderson</u>). <u>Duncan</u> modified and heightened the standard set by <u>Picard</u>. <u>Id.</u> at 367. (Stevens J., dissenting)

If a properly presented federal law claim is not adjudicated in state courts, the AEDPA is inapplicable. <u>Maples v. Stegall</u>, 340 F.3d 433, 436 (6th Cir. 2003). In such instances, the Court "'reviews questions of law and mixed questions of law and fact <u>de</u> <u>novo</u>.'" <u>Id.</u> (citations omitted). If a state court decides a federal law claim, but "does not squarely address the federal constitutional issue in question, but its analysis bears 'some similarity' to the requisite constitutional analysis, we must carefully review both the record and the applicable law, and may reverse only if we conclude that the State recent decision is contrary to or an unreasonable

20

application of federal law." <u>Filiaggi v. Bagley</u>, 445 F.3d 851, 854 (6th Cir. 2006) (quoting

<u>Maldonado v. Wilson</u>, 416 F.3d 470, 476 (6th Cir. 2005). In any event, this modified AEDPA

standard "[n]onetheless bars the court from reversing unless the state's court's decision is

contrary to or an unreasonable application of federal law.'" <u>Maldonado</u>, 416 F.3d at 476.

### 1. Ineffective Assistance of Counsel

On the post-conviction appeal, the Tennessee Court of Criminal Appeal made additional

findings of fact on Petitioner's claims.

> During the post-conviction hearing, the petitioner testified that he believed counsel failed to adequately investigate his case prior to trial. He said that there were medical records that could show that he was unable to drive at the time of the incident due to a broken left leg. Eleven hundred and seventy-eight pounds of steel tube had fallen on his leg, rendering him incapable of walking for eighteen months. He said he told counsel that he was bedridden during the time the crime was alleged, but counsel did not investigate. He said he told counsel about other witnesses that would have been helpful at trial, but they were not contacted. Specifically, he mentioned his ex-wife and his brother as possible witnesses, but counsel always told him he had not spoken to them yet.

> The petitioner testified that he wanted an expert to examine the victim to determine whether she was competent to testify, but, to his knowledge, no attempt was made by counsel to examine her. He agreed that he entered a plea bargain on other charges after he was convicted following trial. He asked the court to vacate the plea so that he could proceed to trial. He said the outcome of the trial affected his decision to plead on the other counts, and he believed he was making a best interest plea. He said he was under the impression that a best interest plea did not have the legal effect of a guilty plea. He said he was not rational, was in a severe state of depression when he entered the plea, and did not fully understand what he was doing. He said that he suffered from Post Traumatic Stress Disorder from his military service and that it affected his judgment. He said that he was receiving treatment while in prison, that he was in a better mental state now, and that he would not have entered the guilty plea. He said he was innocent and would not have done anything to harm the victim.

> On cross-examination, the petitioner testified that he recalled telling the detective that he assisted the victim in engaging in sexual activity with multiple individuals prior to May of 2000. He said that he was ultimately responsible for not paying

21

attention to what was going on. He acknowledged that he knew his confession would be brought up at trial. He acknowledged that he assisted Gaines in moving on two occasions. He said his counsel did produce testimony at trial that the petitioner was never alone with the victim and Gaines during the move. Trial counsel had the victim's brother transported from Arizona to Tennessee to testify as an alibi witness on his behalf at trial, but the jury did not credit the testimony of the witness. The petitioner did not tell the detective that he was injured at the time and did not have the opportunity to commit the offenses. He told the detective that the victim was a truthful and competent individual.

On re-direct examination, the petitioner said there were other witnesses that could have been called to testify on his behalf. He said that he spoke with the detective freely and voluntarily and that he drove himself to the police station. He said the detective never asked him about the events that occurred during the move. Counsel told the petitioner that he could testify but that it would not be a good idea because his testimony would open the door for other things that had nothing to do with this trial. The petitioner said that he should have testified because he could have cleared up a few misconceptions. At the conclusion of his testimony, the petitioner rested his proof.

The State called trial counsel, who testified that he had been a public defender from the time he passed the bar through the underlying case. When the case was tried, he had been a public defender for six or seven years. He said the petitioner was the subject of a thirty-eight count indictment that encompassed a variety of sexual activities alleged to occur over a broad spectrum of time. Some of the counts of the indictment were severed, and the counts involving the case that went to trial involved allegations that, on a particular day, the petitioner and Mr. Gaines engaged in a variety of sexual activities with the victim. Counsel testified that the particular incident was a single, discreet incident that occurred on one day, as opposed to some of the other counts in the indictment. This crime occurred on a specific day at a specific location.

Counsel met with the petitioner prior to trial, and they discussed a multi-point defense strategy. First, they had to show that the victim was not competent as a witness or that her memory was so bad that no one should take her seriously. Second, they had to show that Mr. Gaines was a reprehensible person and should not be taken seriously. Counsel said those two things had to happen for them to have much of a chance at prevailing. Counsel also said they had the victim's brother to testify that he was present at the time of the alleged events and that he did not see anything happen. Counsel said he did not recall discussing any injuries with the petitioner in relation to this trial.

Counsel recalled that the victim was vigorously impeached because she was

22

unable to recollect much of anything. He said it was established that the victim was mentally retarded and had difficulty remembering things. The victim's brother testified that, on the day in question, there was not sufficient time for the particular incidents to have taken place. After the conclusion of the trial, counsel did not give the petitioner any advice on the remaining charges against him. Counsel filed a motion for new trial and a motion for judgment of acquittal after the trial. Because counsel took a sabbatical from the public defender's office, a different public defender was assigned to represent the petitioner for his remaining charges.

On cross-examination, counsel said they tried the case as though the crimes happened on one day. He said it was possible that they happened on multiple days but, "in the realm of the courtroom," it was presented as though it all happened on one day. He said this approach made it was easier for him to defend because they had a witness, the victim's brother, who testified that the offenses could not have occurred on that day. Counsel recalled that it was possible the petitioner opined that he was unable to perform a sex act at the time, but counsel did not have an expert examine the petitioner to determine if he could perform a sex act. The petitioner never told counsel that he did not participate in the move of Mr. Gaines. The petitioner acknowledged that he helped Mr. Gaines move but denied that he had sex with the victim. Counsel did not recall any other alibi suggestions made by the petitioner. He did not recall the petitioner giving him any information worthy of investigation. He did not recall contacting Mr. Gaines' landlord or any of his neighbors. Counsel did not consider calling the petitioner's ex-wife because she was incredibly hostile toward the petitioner at that point.

Next, the State called the counsel who represented the petitioner for the entry of his four guilty pleas. She testified that she had been a public defender for nine years and that she began to represent the petitioner during trial counsel's sabbatical. Plea counsel testified that she was not involved in the petitioner's trial. She was aware that the petitioner had made incriminating statements to the detective with regard to the sexual activity of the victim. She was further aware of statements from charged and uncharged co-defendants implicating the petitioner as participating, facilitating, and setting up sexual activity with the victim. The petitioner had been sentenced to 125 years when she was assigned to represent him. The petitioner seemed agreeable to settle the remaining counts against him given the time he had already received. They reached an agreement with the State for an additional twenty-five-year sentence, to be served concurrently with his existing sentence. They discussed the remaining counts and the possible sentences on each count. She believed the twenty-five years, concurrent to the time he was already serving, was a favorable resolution to the remaining charges. She never considered that his plea was anything other than knowing and voluntary. Plea counsel would not have brought the petitioner to court to plead if she did not

23

believe he was doing so voluntarily.

Plea counsel testified that it was likely the conviction and subsequent 125-year sentence was a factor in his decision to plead. She said that, had the petitioner been acquitted at trial, he probably would not have entered his plea to twenty-five years, concurrent. Plea counsel said that the petitioner never expressed any dissatisfaction with her representation and said it was not her practice to discuss other counsel's representation with clients. She said she tells them that, if they are unhappy with their representation, there is another remedy for that dissatisfaction, eventually. Plea counsel did not have any concerns about the petitioner's competency to enter his plea.

On cross-examination, plea counsel reiterated that she does not discuss a client's dissatisfaction with prior counsel. She did not recall whether the petitioner expressed a lack of satisfaction with the public defender's office. She said she did not see anything that led her to believe the petitioner was suffering from any mental illness or disorder.

Zukowski v. State, 2008 WL 110096, at **14-17.

In his post-conviction appeal, the Tennessee appellate court relied upon federal law,

Strickland v. Washington, 466 U.S. 668 on Petitioner's ineffective assistance of counsel claims:

The petitioner argues that he received ineffective assistance of counsel and specifically contends that counsel was ineffective for failing to investigate (1) his medical records which would demonstrate that he was unable to perform the alleged acts; and (2) the proposed alibi witnesses. The petitioner also argues that the post-conviction court erred in relying on trial counsel's testimony because he said he did not remember multiple things.

The petitioner contends that counsel failed to investigate certain medical records that could have shown his inability to commit the underlying crimes because of an injury he sustained to his left leg. He argues that this leg injury would have raised a reasonable doubt to the jury that he was unable to commit these acts. However, the petitioner has not demonstrated how this evidence would have undermined confidence in the outcome of the case. Trial counsel testified that the petitioner did not assert his injury as a defense to the charges while counsel was preparing for trial. The petitioner has not proved that the counsel's performance was deficient or that the counsel's performance resulted in prejudice so as to deprive him of a fair trial. He has not provided any medical records on appeal and presented none during the post-conviction hearing. We conclude that the petitioner has not met his burden of proof and, therefore, is not entitled to relief on

24

this issue.

Next, the petitioner argues that trial counsel failed to contact certain witnesses he contends would have been beneficial to his cause at trial. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn.Crim.App.1990); see also Scott v. State, 936 S.W.2d 271, 273 (Tenn.Crim.App.1996). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness resulted in the denial of critical evidence which caused the petitioner prejudice. Black, 794 S.W.2d at 757. Neither the trial court nor this court can speculate on what a witness's testimony might have been if introduced by counsel. Id. The petitioner failed to call any of these proposed witnesses during the post-conviction hearing and has failed to show any prejudice. This issue is also without merit.

In his last issue, the petitioner contends the post-conviction court erred by relying on trial counsel's "weak" testimony. It is the function of the post-conviction court to determine the credibility of witnesses and the weight and value of their testimonies brought forth in an evidentiary hearing. . . . Here, the post-conviction court found the testimony of trial counsel to be credible and concluded that his representation was effective. The petitioner has failed to demonstrate that the evidence preponderates against the finding of the post-conviction court. Therefore, he is entitled to no relief on this issue.

Zukowski, 2008 WL 110096, at **17-19.

As to his exhausted claims,[3] Petitioner cites other portions of the post-conviction hearing transcript that he testified that, due to a left leg injury, he was bedridden and incapable of

_____

[3]As discussed infra and as reflected in Petitioner's post-conviction appeal, Petitioner presented only two ineffective assistance of counsel claims. Respondent contends that Petitioner's claim about the victim's competency to testify at trial; that the state trial court's admission of photographs of the victim's genitalia into evidence at trial; that the state trial court improperly enhanced and ordered his sentence to be served consecutively and intelligently were never properly presented to the state courts and should be considered procedurally defaulted. Thus, Respondent's contention that these claims are procedurally defaulted and cannot be considered for habeas relief is discussed infra.

25

walking or driving at that times of the offenses. (Docket Entry No. 17-14, Post-conviction amended petition, Post-conviction technical record at 79-80 of 102; Docket Entry No. 17-15, Post-conviction transcript at 6-8, 11 of 88). Petitioner insists that he told his attorney these facts more than once, but his attorney failed to investigate. (Docket Entry No 17-15 at 8, 9). Petitioner's counsel testified that "I do believe that Mr. Zukowski opined that he was not able to perform a sex act[.]," Id. at 60[4], but counsel did not secure an expert to determine if Petitioner could perform a sex act. Id. Yet, in context, defense counsel also stated that despite Petitioner's crushed leg, "I don't believe he had ever told me that he hadn't participated in the move," on the date of the rape. Id. at 60. Trial counsel also explained that Petitioner's trial defense was that, "he had been with Mr. Gaines. It just that he hadn't had sex with [the victim] when he was moving Mr. Gaines." Id. at 61. The Tennessee Court of Criminal Appeals acknowledged all of this testimony and found as follows:

> Counsel did not recall any other alibi suggestions made by the petitioner. He did not recall the petitioner giving him any information worthy of investigation. He did not recall contacting Mr. Gaines' landlord or any of his neighbors.
>
> * * *
>
> [Petitioner] argues that this leg injury would have raised a reasonable doubt to the jury that he was unable to commit these acts. However, the Petitioner has not demonstrated how this evidence would have undermined confidence in the outcome of the case. *Trial counsel testified that the Petitioner did not assert his injury as a defense to the charges while counsel was preparing for trial.* The petitioner has not proved that the counsel's performance was deficient or that the counsel's performance resulted in prejudice so as to deprive him of a fair trial. He has not provided any medical records on appeal and presented none during the post-conviction hearing. We conclude that the petitioner has not met his burden of proof and, therefore, is not entitled to relief on this issue.

---

[4]The page cite is to the page number of the Court's electronic filing system.

. . . . As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness resulted in the denial of critical evidence which caused the petitioner prejudice. Black, 794 S.W.2d at 757. Neither the trial court nor this court can speculate on what a witness's testimony might have been if introduced by counsel. Id. The petitioner failed to call any of these proposed witnesses during the post-conviction hearing and has failed to show any prejudice. This issue is also without merit.

In his last issue, the petitioner contends the post-conviction court erred by relying on trial counsel's "weak" testimony. It is the function of the post-conviction court to determine the credibility of witnesses and the weight and value of their testimonies brought forth in an evidentiary hearing. See Henley, 960 S.W.2d at 579. Here, the post-conviction court found the testimony of trial counsel to be credible and concluded that his representation was effective. The petitioner has failed to demonstrate that the evidence preponderates against the finding of the post-conviction court. Therefore, he is entitled to no relief on this issue.

Zukowski, 2008 WL 110096, at **16, 17, 18, 19 (Tenn. Ct. Crim. App. Jan 9, 2008) (emphasis added). Of course, Gaines told the detective and testified that Petitioner had sexual intercourse with the victim. Id. at **7-8.

To evaluate these claims, the Sixth Circuit summarized the Supreme Court's precedents governing legal principles on ineffective assistance of counsel claims. Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003). In Mitchell, the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)... the Supreme Court held that an appeals court must reverse a criminal

defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Cronic, 466 U.S. at 659 n. 25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. . . . In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391 . . . (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).

* * *

Within the first category are three types of presumptive ineffectiveness of counsel: The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecutions' case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 740, 742. Here, Petitioner's claims falls within the second category.

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result

28

unreliable.

Id. at 687.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Yet, defense counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). See also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.").

For the exhausted claims, the state courts could reasonably conclude that Petitioner never informed his trial counsel that his leg injury was his defense to the trial rape charges. Moreover, the state courts could reasonable conclude that without any medical proof that Petitioner's leg injury physically precluded him from sexual intercourse, Petitioner also failed to establish any prejudice from any omission of his trial counsel. Similarly, Petitioner's failure to call any of these purported alibi witnesses to establish their exculpatory evidence could reasonaly lead the Tennessee courts to conclude that Petitioner did not establish any prejudice for this claim about his trial counsel. Thus, the Court concludes that these claims do not warrant habeas relief.

29

## C. Defaulted Claims

Respondent contends that Petitioner's claims about his trial counsel's failure to secure an expert on the victim's competency to testify at trial; the state trial court's admission of photographs of the victim's genitalia into evidence at trial, and the state trial court improper enhancement of sentence were never properly presented to the state courts and should not be considered as these claims are procedurally defaulted.

As discussed earlier, a habeas petitioner must present claims to the state courts as federal constitutional issues rather than state law issues with some reference to federal law. Duncan, 513 U.S. at 365-66. This standard is related to "the doctrine of exhaustion [that] requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998). The Sixth Circuit has noted four actions a defendant can take which are significant to the determination whether a claim has been "fairly presented":

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) *phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or* (4) alleging facts well within the mainstream of constitutional law.

McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir. 2000) (emphasis added) (citing Franklin v. Rose, 811 F.2d 322, 326 (6th Cir. 1987). Yet, "[g]eneral allegations of denial of rights to a "fair trial and "due process" no not "fairly present" claims that specific constitutional rights were violated." Id. (citation omitted). Rather "the factual and legal underpinnings of the claim must be presented as a federal claim to the state courts." Pudelski v. Wilson, 576 F.3d 595, 605 (6th Cir. 2009) (citing McMeans).

30

The Supreme Court defined the "Procedural Default Doctrine" for federal habeas

proceedings as barring federal habeas relief in certain instances, stating:

> This Court will not review a question of federal law decided by a state court if the
> decision of that court rests on a state law ground that is independent of the federal
> question and adequate to support the judgment. This rule applies whether the
> state law ground is substantive or procedural. In the context of direct review of a
> state court judgment, the independent and adequate state ground doctrine is
> jurisdictional. Because this Court has no power to review a state law
> determination that is sufficient to support the judgment, resolution of any
> independent federal ground for the decision could not affect the judgment and
> would therefore be advisory.
>
> * * *
>
> The doctrine applies to bar federal habeas when a state court declined to address a
> prisoner's federal claims because the prisoner had failed to meet a state procedural
> requirement. In these cases, the state judgment rests on an independent and
> adequate state procedural grounds.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (emphasis added and citations omitted).

The rationale for this doctrine arises out of judicial respect for federalism and maintaining

comity with state courts, id. at 730-32, and the doctrine also serves a legitimate state interest in

finality of state convictions. Francis v. Henderson, 425 U.S. 536, 542 (1976). State procedural

rules that channel the controversy to the state trial and appellate courts must be honored because

failure to do so "deprives the [state] appellate court of an opportunity to review trial error, and

'undercut[s] the State's ability to enforce its procedural rule[s].'" Murray v. Carrier, 477 U.S.

478, 491 (1986) (quoting Engle v. Isaac, 456 U.S. 107, 129 (1982)).

As the Sixth Circuit stated in Williams, there are two types of procedural default in

habeas actions:

First, a petitioner may procedurally default a claim by failing to comply with state

31

procedural rules in presenting his claim to the appropriate state court. Lundgren v. Mitchell, 440 F.3d 754, 763 (6th Cir. 2006) (citing Washington v. Sykes, 433 U.S. 72, 87, 97 (1977)); see also Maupin v. Smith, 758 F.2d 135, 138 (6th Cir. 1986). If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted. Id.

Second, a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's "ordinary appellate review procedures." O'Sullivan v. Boerckel, 526 U.S. 838, 848-7 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted. Engle v. Isaac, 456 U.S. 107, 125 n. 28 (1982); see also Coleman v. Thompson, 501 U.S. at 731-32. This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." Engle, 456 U.S. at 125 n.28. Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review. Id.

Id. at 806. Petitioner's defaulted claims fall into both categories.

The Sixth Circuit defined the analysis under the procedural default doctrine in Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

\*\*\*

Second, the court must decide whether the state courts actually enforced the state procedural sanction.

\*\*\*

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve

> an examination of the legitimate state interests behind the procedural rule in light
> of the federal interest in considering federal claims.

Id. at 138 (citations omitted). As a matter of federal law, to avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. Covington v Mills, 110 Fed. Appx. 663, 666 (6th Cir. 2004). Those claims must be presented within the time provided by state law or an unexhausted claim becomes a procedurally defaulted claim. Williams v. Anderson, 460 F.3d 789, 806 (6th Cir. 2006).

Petitioner did not present these grounds for his ineffective assistance of counsel claim before the state courts and under state rules those claims are waived under Tenn. Code Ann. § 40-30-106(g) by virtue of his direct and post-conviction appeal and are also time barred under Tenn. Code Ann. § 40-30-102(a). Procedural rules such as statutes of limitations have been found to be independent and adequate. In Coleman, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. In Brown v. Allen, 344 U.S. 443 at 485-86 (1953), the Court also applied the procedural default rule to a state rule that placed time limits on appellate rights. Accord Reed v. Farley, 114 S.Ct. 2291 (1994) (denying writ due to waiver of delay under the Interstate Agreement on Detainers by failure to object at trial and to establish prejudice).

In Hutchison v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations statute on post-conviction petitions and Burford exception in a procedural default analysis:

> Hutchison argues that Tennessee courts' willingness to excuse procedural default
> pursuant to Burford demonstrates that state procedural rules are not regularly
> followed in the context of later-arising claims.

33

Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in Burford and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented....

In Hannah v. Conley, 49 F.3d 1193 (6 th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for post-conviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. Id. at 1197. The Hannah court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. Id. at 1196. The current one-year statute of limitations contains the same mandatory language. See T.C.A. § 40-30-202(a).

Although the previous cases did not present a Burford type later arising claim, we do not find that the state's Burford tolling rules command a different result. . . .

Given that tolling under Burford is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, we conclude that the Burford exception does not render Tennessee's procedural rules inadequate.

Id. at 738-739. (footnotes omitted).

The Sixth Circuit also ruled in Hutchinson that despite the Burford exception to the

Tennessee timeliness rule, Burford was not a separate constitutional claim. Id. at 740-41.

In a word, Hutchinson found the Tennessee limitations rule to constitute a firmly established and

regularly followed state law. Thus, the Court concludes that Tennessee's limitations statute is an

independent and regularly enforced state rule.

The Sixth Circuit has also found that the Tennessee waiver statute, Tenn. Code Ann. §

40-30-106(g), to be an independent and adequate state rule that is regularly enforced. Cone v.

34

<u>Bell</u>, 243 F.3d 961, 969 (6th Cir. 2001), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Bell v. Cone</u>, 535 U.S. 685 (2002)). Thus, the Court concludes that Petitioner's claims that Respondent challenges are procedurally defaulted. <u>Williams</u>, 460 F.3d at 86.

With these procedural defaults, Petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. A fundamental miscarriage of justice requires a showing that the alleged "constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Murray</u>, 477 U.S. at 496. This exception applies only in "extraordinary case[s]." <u>Id.</u>

Cause for a procedural default must depend on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Id.</u> at 753. "Prejudice . . . requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." <u>Jamison v. Collins</u>, 291 F.3d 380, 388 (6th Cir. 2002) (citing <u>United States v. Frady</u>, 456 U.S. 152, 170-71 (1982)). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." <u>Murray</u>, 477 U.S. at 486-87.

### a. Trial Counsel's Failure to Seek Evaluation of the Victim's Competency

Petitioner contends that the state courts unreasonable determined that trial counsel was not ineffective in failing to obtain an evaluation of the alleged victim's competency to testify and given the victim's testimony and that this omission was critical and prejudicial. This claim was

35

never presented to the state courts. Petitioner does not establish or identify any cause as to why this ineffective assistance counsel claim was not presented in the state courts. The facts giving rise to this claim were known at the time of trial. The Tennessee appellate courts rulings in this issue was reflects that the state trial court held a out-of jury competency hearing. Zukowski, 2003 WL 213785, at *14. At that hearing, Deborah Mayberry the victim's former school teacher testified that the alleged victim was mildly mentally retarded and functioned academically at the third or fourth grade level. Id. at **1-2. Mayberry also testified that the victim was generally a truthful child, but at times might deny something that she did. Id.. During this hearing, the victim testified and correctly answered questions about her age, her birth date and her living arrangements when she turned 14. Id. at *2. In his confession to Detective Zoccola, Petitioner admitted that the victim was truthful and in his post-conviction proceeding, stated his belief that the victim was competent to testify at trial. (Docket Entry No. 17-14 at 96).

Petitioner cited the victim's other responses as establishing her incompetence. Petitioner cites other portions of the transcript that the victim "practiced" her testimony with State's attorneys. (Docket Entry No. 17-3, Trial Transcript at 58-59). As to the question, "what grade are you in?," the victim answered: "I don't remember." Id. at 106. The prosecutor then asked if she were in the same grade on her birthday as she is now, to which the victim responded, "yes." Id. The follow-up question was what grade she is in now and the victim stated eighth grade. Id. The victim could not recall the specifics of her most recent birthday in December 2003. Id. at 105. The prosecutor then specifically asked if she received presents and cake on her birthday, the victim replied yes. Id. at 105, 110-111. As to any gift on her birthday from her Aunt Carol with whom she was living at the time, the victim responded, "I don't remember." Id. at 111. The

36

victim referred to her school as McMurray Middle School, id. at 109, but Mayberry, the victim's

teacher testified that the victim had not attended McMurray since the end of the 1999-2000

school year. Id. at 117. The victim could not remember when she stopped attending McMurray.

Id. at 110. When asked ". . . do you remember when you helped J.D. Gaines move?," the victim

replied: "Yes, sir. No sir." Id.

Petitioner does not assert cause as to why this ineffective assistance counsel claim was

not presented in the state courts. Moreover, the district court "must presume that all

determinations of factual issues made by the state court are correct unless the defendant can rebut

that presumption by clear and convincing evidence." Mitchell, 325 F.3d at 737-38 (citing 28

U.S.C. § 2254(e)(1)). The state trial court's determination that the victim was competent at the

time of trial to testify is a factual determination. Petitioner's cited portions of the state transcript

do not qualify as clear and convincing evidence to set aside the trial court's finding of

competence. The Court notes that at the time of his trial, petitioner considered the victim to be

competent to testify. The Court concludes Petitioner fails to show any prejudice attributable to

his counsel for this defaulted claim.

As to his sentencing claim, at the time Petitioner's direct appeal and filing of his post-

conviction petition, the law in Tennessee was that Blakely v. Washington, 542 U.S. 296 (2004)

had not yet been made applicable to Tennessee's sentencing scheme. State v. Gomez, 163

S.W.3d 632 (Tenn. 2005), vacated by Gomez v. Tennessee, 549 U.S. 1190 (2007). On remand,

the Tennessee Supreme Court held in State v. Gomez, 239 S.W.3d 733 (Tenn. 2007) (Gomez II)

that adopted the holding in Cunningham v. California, 549 U.S. 270 (2007), but declined to apply

Apprendi. Gomez II held that the Sixth Amendment is violated by sentences enhanced based on

37

judge-found facts under the Tennessee sentencing system in place prior to 2005. Gomez II, 239 S.W.3d at 739. Yet, on Petitioner's motion to reopen his post-conviction proceedings, the Tennessee Court of Criminal Appeals held that Blakely does not apply retroactively to post-conviction petitions. (Docket Entry No. 36-2).

In light of Apprendi that was rendered in 2000, the legal basis for this claim was reasonably available to counsel in Petitioner's post-conviction proceeding where such claims are presented. Post-conviction counsel failed to raise this claim on his direct appeal on State post-conviction proceeding. In light of the matter, counsel's conduct cannot establish cause. In Wainwright v. Torna, 455 U.S. 586, 587-88 (1982), the Supreme Court made it clear that ineffective assistance of counsel could not be grounds for cause where the proceeding in which the error occurred was not one for which counsel was constitutionally required. Under Ross v. Moffitt, 417 U.S. 600 (1974) and Pennsylvania v. Finley, 481 U.S. 551(1987), the right to counsel does not extend beyond the first appellate process. Thus, counsel errors in state post-conviction proceedings are not grounds for cause because there is no right to counsel for these proceedings. Ritchie v. Eberhart, 11 F.3d 587, 591-92 (6th Cir. 1993). As the Court explained in Coleman,

> [W]e decline . . . to extend the right to counsel beyond the first appeal of the criminal conviction. We held in Ross that neither the fundamental fairness required by the Due Process Clause nor the Fourteenth Amendment's equal protection guarantee necessitated that states provide counsel in state discretionary appeals where defendants already had one appeal as of right. ... Similarly, in Finley, we held there was no right to counsel in state collateral proceedings after exhaustion of direct review. ... Given that a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review, it would defy logic for us to hold that Coleman had a right to counsel to appeal a state collateral determination of his claims of trial error.

Case 3:08-cv-00759   Document 37   Filed 07/09/10   Page 38 of 39 PageID #: 1564

> Because <u>Coleman</u> had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas.

<u>Coleman</u>, 501 U.S. at 756-57.

Thus, this sentencing claim is defaulted and cannot be excused for a lack of a showing of cause and prejudice nor be considered for habeas relief consistent with the Tennessee state courts' ruling. Moreover, the Sixth Circuit rule is also that <u>Blakely</u> does not apply to collateral proceedings. <u>Humphreys v. United States</u>, 398 F.3d 855, 861 (2005).

### b. Admission of Victim's Photographs

The next defaulted claim involves the state trial court's admission of photographs of the victim's genitalia into evidence at Petitioner's trial. Given that Petitioner was charged with rape involving sexual penetration of a child, an expert witness was called to verify that the minor victim's genitalia had been penetrated. This issue was known at the time of trial, direct appeal and the post-conviction proceedings. The Court cannot discern any cause or prejudice for Petitioner's failure to present these federal claims to the state courts.

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___9th___ day of July, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

39